AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br>Qua'darius Dajohn Lamar Johnson<br><br>*Defendant(s)* | ) ) ) ) ) ) ) | Case No. 5:26-mj-1252-PRL<br><br>SEALED |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of see below in the county of Marion in the Middle District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) - Four Counts | August 26, 2026: distribution and possession with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(C).<br>August 28, 2026, September 9, 2026, and September 11, 2026: distribution and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(A). |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

DEA TFO Matthew Baker
*Printed name and title*

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: September 17, 2026

[signature]
*Judge's signature*

City and state: Ocala, Florida

United States Magistrate Judge Philip R. Lammens
*Printed name and title*

**STATE OF FLORIDA** **CASE NO. 5:26-mj-1252-PRL**

**COUNTY OF MARION**

## AFFIDAVIT IN SUPPORT OF A CRMINAL COMPLAINT

I, Matthew Baker, being duly sworn, hereby depose and say:

1. I am a Task Force Officer from the Marion County Sheriff's Office. I am assigned to the United States Drug Enforcement Administration (DEA) Gainesville Resident Office and have been since April 2026. Prior to being assigned to the Gainesville Resident Office, I was assigned to the Unified Drug Enforcement Strike Team (UDEST) in Marion County, Florida since July 2022. My duties and responsibilities include investigating violations of the Controlled Substances Act.

2. During my career, I have conducted and participated in numerous investigations involving violations of federal and state criminal narcotics laws, including unlawful possession with intent to distribute controlled substances, distribution of controlled substances, use of a communication facility to commit narcotics offenses, maintaining a place for the purpose of narcotic sales, distributing and storing controlled substances, and conspiracy to possess with intent to distribute controlled substances. I am familiar with, and have participated in, numerous methods of conducting drug investigations, including, but not limited to, electronic surveillance, questioning of witnesses, search warrants, confidential informants, pen register and trap and trace devices, and undercover operations.

3. I have conducted investigations concerning the identification of co-conspirators through the use of electronic surveillance, physical surveillance, telephone records, and financial records. I have been the affiant for numerous search and seizure warrants, including warrants designed to capture the GPS coordinates of electronic devices. I have debriefed numerous defendants, informants and witnesses regarding their personal knowledge of drug trafficking. Through these debriefings and my training and experience in drug trafficking investigations, I have become familiar with drug traffickers' methods of operation, including methods of distribution, storage, and transportation of controlled substances.

4. The information set forth in this affidavit is based on my investigation, information supplied to me by other law enforcement officers and agents, and information contained within various government databases and records. Because this affidavit is submitted for the limited purpose of establishing probable cause to support this issuance of a criminal complaint, I have not included details of all aspects of my investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause that a violation of federal law has been committed.

5. This affidavit being offered in support of a criminal complaint charging Qua'darius Dajohn Lamar Johnson (JOHNSON) with four violations of 21 U.S.C. § 841(a)(1). As set forth in more detail below, there is probable cause that on or about August 26, 2026, August 28, 2026, September 9, 2026, and September 11, 2026, in

Marion County, Florida, JOHNSON did distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

**CONFIDENTIAL SOURCE-2 (CS-2)**

6. In August 2026, UDEST Agent Travon Boyd provided a confidential source (hereinafter referred to as CS-2[1]) with a phone number XXX-XXX-7227, which was believed to be utilized by JOHNSON. The purpose was for CS-2 to reach out to JOHNSON and attempt to arrange a narcotics transaction. Prior to this, CS-2 was not familiar with JOHNSON.

**August 26, 2026 – Approximately Three Ounces of Cocaine**

7. On August 25, 2026, CS-2 began communicating with JOHNSON. During the communication, JOHNSON agreed to sell CS-2 three ounces of cocaine for $3,000. The transaction was scheduled to take place on the following day.[2] Following the phone call, JOHNSON then moved their communication to Facebook. The majority of the remaining communications between JOHNSON and CS-2 occurred through Facebook Messenger and Facebook video calls. JOHNSON's

[1] CS-2 was working with UDEST as a paid informant. CS-2 has multiple prior felony convictions relating to the possession of controlled substances. As described, CS-2 completed two controlled purchases with JOHNSON. Those controlled purchases were captured on an audio/video recording device. CS-2's description of events to agents was consistent with the recordings of the interactions. After the second controlled purchase, agents became aware that CS-2 had been arrested for felony possession of a controlled substance (THC) and misdemeanor possession of drug paraphernalia. That arrest had occurred prior to CS-2's involvement in the two controlled purchases. Despite being required to do so, CS-2 did not notify agents of that arrest when it occurred. Due to that, CS-2's involvement in the investigation was terminated. As described below, CS-2 was then only otherwise used to introduce a separate confidential source (CS-3) to JOHNSON. Despite the failure by CS-2 to disclose to agents the arrest, CS-2's involvement in this investigation has otherwise been deemed reliable based on the video recorded evidence and agent surveillance.

[2] This phone call happened outside the presence of agents and was not recorded.

Facebook handle is "GuapBoyz General." JOHNSON, via Facebook Messenger, provided CS-2 with the address of 2901 SW 41st Street, Ocala, Florida.[3]

8. On August 26, 2026, CS-2 met with Agent Boyd and Agent O'Grady at a predetermined meeting location in Marion County. During this meeting, Agent Boyd and Agent O'Grady conducted a search of CS-2 and CS-2 vehicle. Both were deemed to be free of any illegal contraband. Agent Boyd provided CS-2 with $3,000 in U.S. currency and a covert audio/video recording device. At approximately 12:50 p.m., CS-2 contacted JOHNSON via Facebook call to notify him that CS-2 was on their way. JOHNSON agreed to meet CS-2 in the parking lot of the apartments.

9. Shortly after the phone call, CS-2 arrived at the meeting location. As CS-2 was arriving, CS-2 contacted JOHNSON. JOHNSON requested CS-2 meet him near building 500. Via the recording device, JOHNSON is observed getting into the front passenger seat of CS-2's vehicle. CS-2 provided JOHNSON with the U.S. currency and JOHNSON provided CS-2 with the cocaine. Shortly after, the transaction ended and JOHNSON exited CS-2's vehicle. CS-2 then returned directly to meet with Agent Boyd and Agent O'Grady, where CS-2 provided Agents with the suspected cocaine. CS-2's person and the vehicle were again searched and determined to be free of any contraband.

---

[3] This is the general address for the Saddleworth Green apartment complex. Johnson is associated with this address. Between October 14, 2025, and March 28, 2026, there have been at least four reported disturbances to law enforcement at Apartment 703 between JOHNSON and his significant other, S.J.

10. Agent Boyd debriefed CS-2. CS-2 advised that they arrived at the apartment complex and contacted JOHNSON, who directed CS-2 to pull into building 500. CS-2 advised JOHNSON entered CS-2's vehicle and sat in the front passenger seat. JOHNSON asked CS-2 if they wanted to taste the cocaine. CS-2 told JOHNSON they trusted him, indicating they did not want to taste it. CS-2 confirmed JOHNSON was the same person CS-2 had completed video calls with via Facebook.

11. Agents review of the audio/video recording of the transaction revealed that JOHNSON had what appeared to be an extended pistol magazine sticking out of his pants pocket, as displayed below:




*Johnson with the pistol magazine in his left front pocket.*

12. Agent Boyd field tested the suspected cocaine and received a positive indication for cocaine content. The cocaine had an approximate weight of 81 grams.[4]

**August 28, 2026, Three Ounces of Methamphetamine**

13. On August 27, 2026, CS-2 again communicated with JOHNSON via Facebook. JOHNSON agreed to sell CS-2 three ounces of crystal methamphetamine for $900. The deal was arranged for the following day.

14. On August 28, 2026, CS-2 met with Agent Boyd and Agent O'Grady at a predetermined meeting location in Marion County. During this meeting, Agent Boyd and Agent O'Grady conducted a search of CS-2 and CS-2's vehicle. Both were deemed to be free of any illegal contraband. Agent Boyd provided CS-2 with $900 in U.S. currency and a covert video/audio recording device. At approximately 11:31 a.m., CS-2 contacted JOHNSON via Facebook to notify him that CS-2 was on their way. JOHNSON confirmed the price would be $300 per ounce of crystal methamphetamine.

15. Shortly after the phone call, CS-2 arrived at the meeting location. As CS-2 was arriving, CS-2 made contact with JOHNSON and notified him of their arrival. Agents Demary and French, who were positioned to conduct surveillance on the JOHNSON's apartment, observed JOHNSON exiting the breezeway leading to the apartment as CS-2 arrived. JOHNSON was observed waving CS-2 over towards him and then getting into the driver's seat of a black Kia sedan (Florida tag

---

[4] Crystal methamphetamine is nearly always 80% or greater purity. This and the crystal methamphetamine from the other purchases would, therefore exceed 50 grams.

KCTQ65, registered to EAN Holdings car rental). CS-2 then got into the front passenger seat of the Kia. CS-2 provided JOHNSON with the U.S. currency and JOHNSON provided CS-2 with the methamphetamine. Shortly after, the transaction ended and CS-2 returned directly to meet with Agent Boyd and Agent O'Grady. CS-2 provided agents with the suspected crystal methamphetamine. CS-2's person and the vehicle were again searched and determined to be free of any contraband.

16. Agent Boyd debriefed CS-2. In substance, CS-2 advised that they arrived at the location and contacted JOHNSON, who directed CS-2 to park next to and enter his vehicle. The CS advised they got into the front passenger seat of JOHNSON's vehicle. The crystal methamphetamine was already in the passenger door of JOHNSON's vehicle. The CS gave JOHNSON the $900 that had been supplied by law enforcement. JOHNSON indicated to the CS that they should taste the crystal methamphetamine. The CS placed a small piece in their mouth, then exited the vehicle. The CS-2 immediately spit it out.[5]

[5] Based on my training and experience, I know that it is not uncommon for drug dealers to request individuals who purchase from them to try, or sample, the controlled substance. One of the reasons drug dealers will do this is to try and identify if the person they are selling to is a law enforcement officer or working with law enforcement. During this transaction, JOHNSON also closely examined CS-2's cellular telephone before telling CS-2 to try the methamphetamine. CS-2 can be heard on the recording device physically spitting out the methamphetamine after taking a couple of steps away from JOHNSON's vehicle. During the prior transaction on August 25, 2026, when JOHNSON asked CS-2 if CS-2 wanted to try the cocaine, JOHNSON's hand was on the extended ammunition magazine sticking out of his pocket. Prior to asking that question, JOHNSON told CS-2, "I was just making sure you weren't the police." Based on my training and experience, all of these circumstances indicate that JOHNSON was suspicious of CS-2. CS-2's actions were aimed at reducing that suspicion for safety.

17. Agent Boyd field tested the suspected crystal methamphetamine and received a positive indication for methamphetamine content. The crystal methamphetamine had an approximate weight of 84 grams.

18. Following the transaction, Agents Demary and French observed JOHNSON go back into the breezeway leading to the apartment.

**UTILIZATION OF CONFIDENTIAL SOURCE-3 (CS-3)**

19. UDEST Agent Boyd developed another second confidential source (hereinafter referred to as CS-3[6]). Information provided by CS-3 has been deemed credible and independently corroborated by law enforcement throughout this investigation. In September 2026, Agent Boyd provided CS-3 with phone number XXX-XXX-1350.[7] The purpose of this was for CS-3 to reach out to JOHNSON and attempted to arrange a narcotics transaction. Prior to this, CS-3 was unfamiliar with JOHNSON. CS-2 and CS-3 are known to each other. At Agent Boyd's direction, CS-2 contacted JOHNSON on CS-3's behalf to introduce CS-3 to JOHNSON.

**September 9, 2026 – Three Ounces of Methamphetamine**

20. On September 9, 2026, I, along with Agents Boyd and Zaino, met with CS-3 at a predetermined meeting location within Marion County. CS-3 conducted a controlled phone call to JOHNSON at XXX-XXX-1350. JOHNSON agreed to sell

[6] CS-3 is working with UDEST as a paid informant. Based on my review of CS-3's criminal history, CS-3 does not have any prior felony convictions. CS-3's most recent criminal history includes a withhold of adjudication on misdemeanor possession of drug paraphernalia. That occurred within the last five years.
[7] In September 2026, CS-2 contacted Agent Boyd and identified this phone number as an updated phone number for JOHNSON.

CS-3 three ounces of crystal methamphetamine for $900. JOHNSON requested CS-3 meet at a fast-food restaurant on West Silver Springs Blvd. in Ocala, Florida. During this meeting, Agents Boyd Zaino conducted a search of CS-3 and CS-3's vehicle. Both were deemed to be free of any illegal contraband. Agent Boyd provided CS-3 with $900 in U.S. currency and a covert video/audio recording device.

21. During this time, Agents Salgado and Demary conducted surveillance at JOHNSON's apartment. Agents Salgado and Demary observed JOHNSON exiting the breezeway which leads to the apartment. JOHNSON was then observed entering into the same black Kia from the previous controlled purchase.

22. Shortly after the phone call, CS-3 began traveling to the fast food restaurant. Once CS-3 arrived, they got into the front passenger seat of JOHNSON's vehicle. CS-3 provided JOHNSON with the $900. JOHNSON then counted the money and directed CS-3 to the passenger door, which is where the methamphetamine was located.

23. The CS-3 left the location after meeting with JOHNSON and returned directly to meet with Agent Boyd and Zaino. CS-3 provided agents with the suspected crystal methamphetamine. CS-3 and the vehicle were again searched and determined to be free of any contraband.

24. Agent Boyd debriefed CS-3. In substance, CS-3 advised that they arrived at the location and contacted JOHNSON who was already there. CS-3 and JOHNSON parked next to each other. JOHNSON then directed CS-3 to get into JOHNSON's vehicle. CS-3 provided JOHNSON with the $900 in exchange for the

crystal methamphetamine which was located in the front passenger door. JOHNSON and CS-3 had a discussion about the price of the crystal methamphetamine because JOHNSON had expected CS-3 to pay more. CS-3 then exited the vehicle.

25. During the transaction, Agent Boyd conducted surveillance, and observed CS-3 meet with JOHNSON.

26. Agent Boyd field tested the suspected crystal methamphetamine and received a positive indication for methamphetamine content. The crystal methamphetamine had an approximate weight of 84 grams.

**September 11, 2026 – Three Ounces of Methamphetamine**

27. On September 11, 2026, CS-3 met with Agent Boyd and Agent Zaino at a predetermined meeting location within Marion County. CS-3 conducted a controlled phone call to JOHNSON at 352-362-1350. JOHNSON agreed to sell CS-3 three ounces of crystal methamphetamine for $1,250. JOHNSON indicated to CS-3 that CS-3 still owed him money from the previous deal. JOHNSON directed CS-3 to wait at a business while JOHNSON got a ride. During this meeting, Agent Boyd and Agent Zaino conducted a search of CS-3 and CS-3's vehicle. Both were deemed to be free of any illegal contraband. Agent Boyd provided CS-3 with $1,250 and a video/audio recording device. During a secondary phone call, JOHNSON directed CS-3 to meet at a convenience store on SW 42nd Street.

28. During this time, Agent Canterberry conducted surveillance on JOHNSON's apartment. At approximately 3:01 p.m., Agent Canterberry observed a silver Gensis SUV (FL tag QNIU65), arrive near the apartment. Shortly after arriving, Agent Canterberry observed the driver of that vehicle, J.D.T., enter into the apartment. At approximately 3:23 p.m., Agent Canterberry observed JOHNSON and J.D.T. exit the apartment and enter the silver Genesis. I observed the Genesis leaving the area of the apartment, still within the apartment complex, and began to follow it. I followed the vehicle as it drove directly to the convenience store, which is located approximately one mile away from JOHNSON's apartment.

29. Once JOHNSON arrived, he made contact with CS-3 and directed CS-3 to a grocery store parking lot within the same shopping plaza. Once parked, JOHNSON exited the Genesis and entered the front passenger seat of CS-3's vehicle. JOHNSON placed the methamphetamine into the center cup holder and CS-3 provided JOHNSON with the U.S. currency.

30. After the transaction ended, CS-3 returned directly to meet with Agents Boyd and Zaino. CS-3 provided the agents with the suspected crystal methamphetamine. CS-3 and the vehicle were again searched and determined to be free of any contraband.

31. During the transaction, Agent Boyd conducted surveillance and observed JOHNSON exit the Gensis and get into CS-3's vehicle and then get back into Genesis following the transaction.

32. Agent Boyd field tested the suspected crystal methamphetamine and received a positive indication for methamphetamine content. The crystal methamphetamine had an approximate weight of 71.5 grams.

## CONCLUSION

33. Based on the foregoing, there is probable cause that JOHNSON did distribute and possess with intent to distribute a controlled substance August 26, 2026, August 28, 2026, September 9, 2026, and September 11, 2026, in violation of 21 U.S.C. § 841(a)(1).

This concludes my affidavit.

TFO Matthew Baker
Drug Enforcement Administration

*Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 4.1 and 4(d) before me this* 17th *day of September 2026.*

PHILIP R. LAMMENS
United States Magistrate Judge